(No. 14707.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. JAMES SWEENEY et al. Plaintiffs in Error.

*Opinion filed October 21, 1922.*

1. CRIMINAL LAW—*defendant is entitled to preliminary hearing to determine admissibility of alleged confession.* Where a confession is offered in evidence the defendant is entitled to have the evidence of the circumstances under which it was made heard by the court out of the presence of the jury for the purpose of determining whether the confession is admissible, and on such hearing the defendant may cross-examine the witnesses and introduce his own evidence and is entitled to a ruling of the court as to the admissibility of the alleged confession.

2. SAME—*when confessions are not shown to be admissible.* Where defendants in a preliminary hearing to determine the admissibility of alleged confessions testify that the confessions were forced from them by the torture of deprivation of food and sleep, by beating and physical violence, and their testimony is not denied by any witnesses for the prosecution except the statement of a police officer that he did not know of any ill-treatment when he was present, the court cannot entirely disregard the testimony of the defendants and admit the confessions; and written statements following the confessions that they were freely and voluntarily made cannot render them admissible.

3. SAME—*when alleged confession cannot be introduced by way of impeachment.* An alleged confession which has not been proved to be admissible by preliminary examination cannot be introduced to impeach the answers given by the defendant on cross-examination as to whether or not he had made certain statements in answer to certain questions; and where the answers and questions so read to the witness implicate his co-defendant, the error in allowing them to be read in the presence of the jury is not cured by an instruction that nothing contained in the statements should be taken as evidence against the co-defendant.

4. SAME—*when defendant should not be questioned as to his nick-name.* In the prosecution of defendants charged with making or handling explosives for the purpose of the unlawful destruction of property, it is error to ask one of the defendants if he had ever been known as "Soup" Bartlett, as the term "soup" is known as a slang expression for nitro-glycerine, and the question implies that the defendant was known by that name because of his unlawful handling of nitro-glycerine.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. M. L. McKINLEY, Judge, presiding.

O'BRIEN, PRYSTALSKI & OWEN, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

James Sweeney and Harry Bartlett were indicted in the criminal court of Cook county, together with Albert Peterson, Samuel Gibson, Thomas Corcoran, Jene Coleman, Andrew Kerr, Joseph Bangora, Charles Borigan and one Sullivan, whose first name was unknown. The indictment in two counts charged a violation of "An act to regulate the manufacture, transportation, use and sale of explosives, and to punish an improper use of the same," approved June 16, 1887. (Hurd's Stat. 1921, p. 1072.) The first count charged that the defendants did make, manufacture, compound, buy and procure dynamite, nitro-chlorate and other explosive compounds with intent that the same should be used for the destruction of life and property. The second count charged the defendants with having dynamite, nitro-chlorate and other explosive compounds with intent that the same should be used to injure and destroy a building of the Beehive Laundry Company. On motion of the State's attorney a separate trial was ordered for Sweeney and Bartlett, they were found guilty and sentenced to the penitentiary for an indeterminate period, and they prosecute this writ of error to secure a reversal of the judgment.

It was shown by the watchman at the Beehive laundry that he went to work the night of February 19, 1921, about seven o'clock, and about one o'clock he was near the engine room when there was an explosion, which caused a loud noise and blew in the large back door, together with a big

cloud of smoke and dirt. This was the only evidence of the use of an explosive. The only evidence connecting the plaintiffs in error with the crime was the testimony of Andrew Kerr, who was indicted with them, and their confessions. Kerr's testimony was substantially as follows: He was a stationary engineer employed in the latter part of 1920 by the Mechanics Laundry and Supply Company and a member of Local 401 of the Stationary Engineers' Union, which on November 22, 1920, called a strike against the laundries. He first met Sweeney outside Engineers' Hall, 814 West Harrison street, the last week of November, 1920. On February 16, 1921, in the hallway outside of Engineers' Hall, Kerr, Sweeney, Bartlett, Turner, an engineer at the Beehive laundry who was on strike, Gibson, who was organizer for Local 402, Peterson, who was business agent of Local 401, and Corcoran, met, and Sweeney said the stuff was all ready to plant some bombs when they were ready to get them planted. Bartlett said it was real stuff. Turner said he wanted Beehive done. Peterson said, "No; Mechanics and Schrivers laundries." Turner reminded Peterson of his promise that Beehive should be done first, and Peterson said, "All right; I will keep my promise; we will do Beehive and Mechanics." Sweeney said, "Give us three addresses; in case we miss Mechanics and Beehive we can get the third one." Turner said, "Make sure you give him the Beehive." Peterson gave Sweeney addresses of the Beehive, Schrivers and Mechanics laundries and said two were to be done that night. Turner said, "Will you see us to-morrow? that will be Thursday, and I will give you a drawing of the rear of the Beehive laundry, where you can place the bomb." Sweeney and Bartlett both assented and said that they would be back at the hall Thursday after they got the third party, to find out if they could work Friday night. Thursday at one o'clock there was another meeting of the same persons at the same place. Sweeney said, "Everything is all set for

to-morrow night." Gibson took $300 from his pocket and gave it to Kerr, to be paid to Sweeney and Bartlett when the jobs were done. Turner furnished the drawing to Sweeney and Bartlett, who said they would try to put it in the coal chute to demolish the engine room. Gibson wanted a receipt, and Sweeney said no receipts were going to be passed in this thing; that he would have to read the newspapers. That same afternoon Corcoran, Gibson and Kerr were leaving the hall and met Sweeney and Bartlett at VanBuren and Halsted streets. Corcoran asked Sweeney if everything was all set for to-morrow night. Sweeney said, yes; that he was waiting for the other party that was to furnish the dynamite and throw the bombs to come around in an automobile. Corcoran and Gibson left, and at ten minutes after three o'clock Bangora and Borigan came along in a touring car and stopped, and Sweeney went over and talked with them about ten feet from Kerr and Bartlett. Kerr heard Bangora say: "Yes, it is all set for to-morrow night; I have got the stuff and the two bombs are made; we will plant them to-morrow night; if I do not see you in the meantime I will meet you at the other corner at 7:30 to-morrow night; don't forget." The car moved on and Sweeney came back to Kerr and Bartlett, and Kerr asked, "Is that the party that you have been waiting for,—that plants the stuff?" Sweeney said, "Yes; that is him; everything is all set for to-morrow night; now, you better stay home to-morrow night and have an alibi, and tell Turner to do the same thing." Kerr asked, "Why does he want $25, instead of $10, in advance for the stuff?" Sweeney said, "Well, because there are two bombs going; but what do you care? he has got the twenty-five anyhow." Kerr said, "Yes, it is not coming out of my pocket," and asked, "Where did you get the stuff?" Sweeney said, "You can find out to-morrow night where the stuff is got; no, he gets it somewhere else and plants it, and when he takes us up he takes us out and we pick it up; that is the only trouble,—

he won't let us know where he gets it." At 7:30 the next (Friday) night Kerr saw Sweeney and Bartlett standing at the corner of VanBuren and Halsted streets. Bangora and Borigan came up in a car, Sweeney and Bartlett got in, and they drove west. On the following Saturday Sweeney and Bartlett went to Kerr's house. Sweeney had a newspaper and showed the headlines to Kerr, saying, "How does that look for advertising? 'Two Bombs Rock the West Side.' Look what they done! $25,000 Beehive, $10,000 to Mechanics." Sweeney told Kerr not to go near the hall that day, saying, "They may make some arrests." Kerr paid them the $300, taking Sweeney's receipt. The receipt read:

*"Saturday, Febr. 19th, 1921.*

"Received from Kerr $300.00 for Beehive Ldy. & Mechanics Supply Co. Jobs.

J. SWEENEY."

Part of the body of the receipt was written with one pencil and the last line with another. Kerr testified that the first pencil broke and he used another to finish. Sweeney, as a witness, testified that he signed it in blank, along with several others, because Kerr asked him to do so, telling him that he had been spending some money and he wanted to make it all right with his wife.

Kerr testified that Sweeney told him how the bombs were set off, and this testimony appears in the abstract as follows: "I asked Sweeney why they done the Mechanics laundry. I did not think it ought to be done because they had the address of Schriver's and Beehive. Sweeney says: 'There was two coppers on the corner of Hoyne avenue and VanBuren, at the call-box, and there was one at the call-box at VanBuren and Robey, the next block, and Beehive is situated in between, so we could not come out that way from the alley entrance and we had to drive over to Congress street, and we always lit the fuse for the bombs in the car. We got confused with Turner's sketch. The orders were not to kill anybody on that Beehive job, and we did not want to kill anyone on it, so we started looking for

the coal chute, and just as we were going to drop it in there the night watchman in the Beehive laundry came back and started shoveling coal in the boiler. We could not drop it in the boiler and demolish the boiler room or we would kill him. We had to be quick. The fuse was burning two and a half minutes then. We had to run over across the street to get to the car. By the time we got two and one-half blocks north of there to go to Schriver's the bomb let go, so we figures we would run on over to Mechanics, and we drove there, and it was easy sailing there, and we planted the bomb in the back, like we had instructions to do. Figuring that job, Siebert was sleeping in the engine room at the Mechanics and they wanted to kill him. So we went over and planted it in the rear of Mechanics laundry, got in the automobile again, and we wound up at Fulton and Leavitt streets before the bomb exploded. From there we went on home. And here is the headline in the paper. Now maybe they will be satisfied. It is good advertising and they are getting off cheap. How is it there is only $300?' I told him, 'I don't know, but I will see them about the other $100.' He said, 'We want it and want it quick or I will use our own means to get it, and you know what our means is. We will set two bombs like that every two weeks. That will bring them to time.' "

Kerr also testified that Sweeney said he used two sticks of dynamite on each of those laundries, and that he gave Sweeney the balance of the $400, then amounting to $70, in a saloon at the corner of Jackson boulevard and California street on February 26 or 28, and took from him a receipt which was in evidence, as follows:

"*Mar. 1st.*

"Received from Kerr $100.00 final payment of $400.00 for Beehive Ldy. & Mechanics Supply Co.    J. SWEENEY."

Kerr had previously paid $30, taking no receipt. Sweeney testified that he signed this receipt also, but the words following "$100.00" were afterwards added. Kerr

testified that he had worked two years at the Mechanics laundry and had not known Siebert before; that he knew that the explosion at the Mechanics laundry was going to occur and it was the intention to kill Siebert; that he had not worked for the five months prior to the giving of his testimony but had been living at the Brevoort Hotel with a policeman, paying no bills, and he expected nothing,—neither reward nor punishment.

This testimony, if believed, was sufficient to require a verdict of guilty, but not only was the witness who gave the testimony an accomplice in the crime charged, but he displayed himself to be of such base, depraved and vicious character,—so free from any recognition of moral or legal obligation,—that the jury might well have refused to base their verdict on his testimony alone. It was therefore of the utmost importance to a fair trial of the plaintiffs in error that no incompetent evidence should be admitted to corroborate Kerr's testimony.

The People offered in evidence a statement of Sweeney, made at detective headquarters on the night of May 22, 1921, in the presence of Charles Wharton and Milton Smith, assistant State's attorneys, police lieutenant Michael Hughes, police sergeant Charles E. Egan, and other police officers, and taken down in shorthand by Louis W. Temple. It was objected to and evidence was heard out of the presence of the jury as to the circumstances under which it was made. The only witnesses examined by the People were Egan and Temple. Egan was uncertain about the day of Sweeney's arrest, but said that he was taken from the place where he was arrested to detective headquarters. He was brought in in the afternoon and Egan was called to headquarters at seven o'clock in the evening by Chief Hughes. He saw Sweeney there go down into the cell-room. He next saw him about seven or eight hours afterwards upstairs in Chief Hughes' office, about one o'clock in the morning. There were present Hughes, Lieutenant O'Con-

nor, Egan, and officers Gasperik and Paulding. Egan was
in and out for two hours and Sweeney was being questioned.
During that time he denied participation in the crime. He
was being questioned from one o'clock in the morning un-
til three. Chief Hughes was questioning him in regard to
bombs, in regard to his connection with Kerr, and his em-
ployment,—getting his general history. Sweeney protested
that he had nothing to do with the crime. Egan left after
three o'clock. Everybody was getting ready to go when
Egan left. Sweeney was still talking to Hughes. This was
three o'clock in the morning, and Egan did not see Sweeney
again until afternoon, when Sweeney was taken over to the
State's attorney's office, where he was from two o'clock un-
til eleven o'clock that night. Sweeney, Bartlett, Bangora,
Borigan, Chief Hughes, Smith, officers Paulding, Burke
and Egan, were there. They were in different rooms in
the State's attorney's office. Egan was in Day's room and
was in and out, and Sweeney was on a bench in the hall.
During that time Egan says there were no threats or abuses
shown to Sweeney, and as far as he knows no immunities
or reward offered to Sweeney or any promise made to him
if he would talk. Sweeney was taken from the State's
attorney's office to the detective bureau. Different people
were talking to him, among them assistant State's attor-
neys Smith and Wharton. Sweeney was there until three
o'clock in the morning. The next afternoon Wharton,
Smith and Chief Hughes talked to Sweeney in Hughes'
office. That conversation lasted until about half-past seven
or eight o'clock. Sweeney was being questioned with ref-
erence to his participation in the crime and denied it.
Smith was questioning him. Wharton would interrupt once
in a while and Hughes sometimes. Sweeney did not admit
any participation in the crime. All went out to supper
about seven o'clock and Sweeney was put down-stairs.
Egan does not know what was done with him. After they
came back, about nine o'clock, he saw Sweeney in Hughes'

office. Smith, Wharton, the stenographer and Hughes were present. Egan was in and out there until one o'clock, when Sweeney made the statement. During the evening when he was there, no one, that he knew of, abused or mistreated Sweeney. Egan did not see anybody mistreat him or hear anybody make him any promise of immunity or reward or evasion of punishment if he would make a confession. Sweeney was being questioned again until eleven o'clock or later, when Kerr was brought in, and the questioning then went right on until three o'clock in the morning. Kerr did not participate in the questioning, but he spoke to Sweeney when he came in, saying, "You might as well tell the truth; I have told everything;" and Sweeney said, "I will tell all, but you will come along with me; you wont get out of it as easy as you think you will." About half-past one o'clock in the morning Sweeney started to make his statement. Hughes, Wharton, Smith, Egan, Sweeney and Temple, the stenographer, were present.

Temple testified that he reported to the room on the second floor of detective headquarters about eight o'clock in the evening; that he remained at the headquarters until morning, and at 1:30, when Sweeney made his statement, Temple took it down. There were present, Chief of Detectives Hughes, assistant State's attorneys Wharton and Smith, Sergeant Egan, officers Gasperik and O'Connor, and several other officers. Temple took stenographic notes of the questions asked by Wharton and Smith and one or two questions by the officers and of the answers made by Sweeney. The statement closed with this statement, made in answer to questions asked: "This statement I have made is free and voluntary, of my own free will and accord. There have been no promises made or threats made. I do not expect any reward. I do not expect anything. There was no force used. I have been treated all right. The police have treated me fairly. Everything that happened here is the truth, the whole truth, all I know. I know

Mr. Smith is an assistant State's attorney and Mr. Charles S. Wharton also an assistant State's attorney. I have made this statement in the presence of Charles Egan, William E. O'Connor and Chief of Detectives Michael Hughes. I realize that the statement can be used against me, if you want to use it against me, as to anything that is against me."

⌜Sweeney testified that he was arrested on Thursday, May 19, at 1:30 or 2:00 o'clock, and kept at Brighton Park station until about noon the next day, at which time he was taken to Chief Fitzmorris' office in the city hall and kept there about an hour. He was then taken to the State's attorney's office and questioned for three or four hours by Smith, Wharton and Chief Hughes, of the detective bureau. He remained in the State's attorney's office until early Saturday morning, when he was taken to a cell and remained there about fifteen or twenty minutes and then taken across the street to the central station by three officers. He was kept there about fifteen or twenty minutes and was then taken to Chief Hughes' office. The three officers said, as they took him across the street, that they would show him the goldfish. They showed him the goldfish, which was a beating. They dragged him around by his hair and started beating him with a rubber hose. He said that Chief Hughes beat him, and two or three other officers whom he did not know by name; that Egan was there at the time and used his fist; that he could recognize the other two officers and had seen one of them in the court room since the trial started,—that is, one besides Egan. He said that they told him at the time that he would either make a statement and come clean and tell everything he knew, and plenty besides, or be found out in some prairie. Wharton and Smith were not there at the time, but Chief Hughes told him he would be found out on the prairie. He was then taken downstairs to a cell for about three-quarters of an hour and then back to Hughes' office and again beaten. The police officers kept telling him to make a statement, and then he

was dragged down-stairs to a cell again for an hour or an hour and a half and was then taken up-stairs and beaten again. From the time he was taken from the Brighton Park station he did not get any sleep, and he was given one sandwich to eat at the State's attorney's office and had one cup of coffee. After this final beating he made the statement which was admitted in evidence as his confession. The only contradiction of his testimony was Egan's statement which has been mentioned,—that he did not see any ill-treatment or abuse during the time he was present.

Bartlett testified that he was arrested about one o'clock Wednesday afternoon and taken to the Hudson avenue station until Friday afternoon, when he was taken to the office of the chief of police for about two hours. He was then taken to the State's attorney's office, where he was kept until about two o'clock in the morning, and during that time questioned by Smith, Wharton and Hughes. He was then taken to the central station and kept there about two hours and then taken to Hughes' office. Hughes, O'Connor, Gasperik, and others, were there. They were hitting him. He did not talk. Saturday he was questioned ten or fifteen times. There was more violence on Sunday morning, when he was brought up the last time. He did not remember making any statement. While at Hudson avenue he got a sandwich now and then. On Friday he got one sandwich at the State's attorney's office, but he got nothing to eat Saturday and no sleep Saturday night.

Confessions are competent evidence only when they are voluntarily made. (*People* v. *Buckminster,* 274 Ill. 435.) Whenever a confession is offered in evidence the defendant is entitled to have the evidence of the circumstances under which it was made heard by the court out of the presence of the jury for the purpose of determining whether the confession is admissible. On such hearing the defendant has the right to cross-examine the witnesses for the prosecution and to introduce evidence himself as to the circum-

stances of the confession, and after the hearing has a right to a preliminary ruling by the court as to the admissibility of the confession. (*Zuckerman* v. *People,* 213 Ill. 114; *Bartley* v. *People,* 156 id. 234; *People* v. *Rogers,* 192 N. Y. 331; *People* v. *Brasch,* 193 id. 46.) This course was pursued in the present case, but there was no denial of the charge that these men, from the time of their arrest until the time that the statements were made, were continuously subjected by the State's attorneys and the officers having them in custody to prolonged questioning at unusual and unreasonable hours; that they were not allowed to sleep; that they were not given necessary food, and that they were beaten. The extent of Egan's testimony was that he did not know of any ill-treatment, threats or promises when he was present, but the specific facts stated in the testimony of the defendants were not met by any denial.

The duty of the prosecution in regard to confessions is indicated in the case of *People* v. *Rogers,* 303 Ill. 578, in which the State's attorney contented himself with examining the one man who knew the least about what had taken place, and it is said that the court was warranted in excluding the confession unless all the police department men engaged or present at the sweating of the defendant were called as witnesses and satisfied the court in good faith that the confession had not been so obtained by them. The court, in conducting this investigation for the purpose of determining whether the confessions were admissible in evidence, had no right to disregard the testimony of the plaintiffs in error that the confessions were forced from them by the torture of deprivation of food and sleep, by beating and physical violence, without even a denial of the facts to which they testified. The statements at the end of Sweeney's confession are of no weight, because they are a part of the confession procured by the same means at the same time and subject to the same infirmities. It was error to permit these confessions to go to the jury.

304—33

It is argued that proper objection was not made to the introduction of these confessions; that at no time was an objection made on the ground that the confessions were not voluntary. When the State's attorney began an examination of Egan as to the statements of the defendants they objected, and thereupon the jury was withdrawn and evidence was introduced in regard to the circumstances under which the statements were made. The court and the State's attorney understood that the objection was that the confessions were not voluntary. The only object of the introduction of this testimony was to show that the statements were made under such circumstances that they were competent. The question was not, however, left to stand on the general objection. After the preliminary evidence was heard, counsel for the defendant stated, "My point is that they are proving the *corpus delicti* by a confession," and the court overruled that objection, but before the matter was submitted to the jury an objection was made on behalf of Bartlett that the introduction of any statement by Sweeney was not permissible on the ground that his statement made out of the presence of Bartlett was not competent against him. The court overruled that objection, and thereupon the defendants made the further objection that no foundation had been laid for the introduction of Sweeney's statement. That is the objection that is presented here. The court overruled it, but he should have sustained it.

Bartlett's confession was not offered in chief, but on cross-examination each question and answer contained in it was read to him and he was asked if he had not made the answers contained in the statement to each one of the questions asked. He denied doing so, and in rebuttal his statement was introduced by way of impeachment. A general objection was made to the impeaching questions asked Bartlett on cross-examination, and after about half the questions and answers had been read to the witness an objec-

tion was made that the cross-examination was not competent against Sweeney, whom the statement had implicated from the beginning. The court instructed the jury, orally, that nothing contained in the statement should be taken as evidence against Sweeney. This statement was not competent against Sweeney, and the error in its admission against him was not cured by the instruction. (*People* v. *Buckminster, supra.*) Though some of the questions had been permitted without the making of this objection, when the objection was made to other questions it should have been sustained.

The objection made to the introduction of the statement in rebuttal by both the plaintiffs in error should have been sustained, because, since the statement was incompetent in chief because made under such circumstances as to be without probative value, it was equally without probative value in rebuttal by way of impeachment. *Shephard* v. *State,* 88 Wis. 185; *People* v. *Yeaton,* 75 Cal. 415; *Harrold* v. *Territory of Oklahoma,* 129 Fed. 47; *Morales* v. *State,* 36 Tex. 534; *Brown* v. *State,* 55 Tex. Crim. 572.

The plaintiffs in error contend that there was no proof of the *corpus delicti* except by the confessions. There was evidence that a conspiracy existed, to which all the defendants were parties, to injure the property of the Beehive laundry and other laundries by the explosion of bombs; that the plaintiffs in error agreed to procure the bombs and cause them to be exploded at a certain time at the Beehive laundry and other places; that they said that they had made an appointment with the two conspirators who they said were to furnish the explosives and throw the bombs at a certain time and place; that at that time and place plaintiffs in error met the other two and they went away together in an automobile and soon afterward the explosion occurred at the time and place agreed upon; and this evidence tended to prove the charge that the defendants procured some explosive compound with intent that it should be used for the destruction of life and property, and that

they had some explosive compound with the intent that the same should be used to injure and destroy a building of the Beehive Laundry Company. On the cross-examination of Bartlett he was asked, and required to answer over objection, if he had ever been known as "Soup" Bartlett. It is argued because the term "soup" is a slang expression for nitro-glycerine, that the question implied that the defendant was known by that name because of his habit of handling nitro-glycerine. The question, under ordinary circumstances, might be harmless. There was no legitimate reason for asking it, and in a trial upon this charge it ought not to have been asked, for it was an intimation that the activities of Bartlett in connection with nitro-glycerine had procured him the sobriquet.

Kerr testified that in the morning after the explosion Sweeney produced a newspaper having these headlines over an account of the explosion and referred to it as a good advertisement: "2 Bombs Rock West Side; Laundries Wrecked in Labor War; Police Guard Area; Mysterious Third Blast is Heard." It is claimed that the headlines were inadmissible because the article was mutilated and that the words themselves were prejudicial. The articles were producd by Sweeney as evidence of the fact that the plaintiffs in error had rendered the services for which they were employed, and it was not error to admit them.

It is insisted that it was error to give the following instruction:

"The court instructs the jury that any person abetting or in any way assisting in making, manufacturing, compounding, buying, selling, procuring, disposing of, storing, removing, or transporting any dynamite, nitro-chlorate or other explosive compound as above named, either by furnishing the materials, ingredients, skill, means or labor, or by acting as agent or in any manner acting as accessory before the fact, knowing or having reason to believe that the same is intended to be used by any person or persons in

any way for the unlawful injury to or destruction of life or property, shall be deemed a principal and, upon conviction, shall be subject to the same punishment as provided in section 1 of this act."

This instruction is a copy of section 2 of the act under section 1 of which the defendants are indicted. It is not applicable to either count of the indictment against plaintiffs in error or based on the evidence. It ought not to have been given.

The plaintiffs in error were sentenced under the Parole law and argue that it is unconstitutional. It has often been held constitutional. *People* v. *Doras,* 290 Ill. 188; *People* v. *Connors,* 291 id. 614; *People* v. *Martin,* 303 id. 233.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*