(No. 17468.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROCCO MAGGIO, Plaintiff in Error.

*Opinion filed February 16, 1927.*

1. CRIMINAL LAW—*defendant is entitled to preliminary hearing to determine admissibility of alleged confession.* Where a confession is offered in evidence the defendant is entitled to have the evidence of the circumstances under which it was made heard by the court out of the presence of the jury for the purpose of determining whether the confession is admissible, and he is entitled to a ruling of the court on that question before the confession can be received in evidence.

2. SAME—*State cannot cross-examine the defendant by reading from alleged confession not offered in evidence.* Where the prosecution declines to offer in evidence an alleged confession after the defendant has asked for a preliminary hearing as to its admissibility, it is not proper, in cross-examining the defendant, to read certain questions and answers from the alleged confession and ask the defendant whether or not he had made the answers to the questions, as the statement or confession, being incompetent in chief, is equally without probative value by way of impeachment.

3. SAME—*defendant may cross-examine witness as to grant of immunity—former trial.* A defendant against whom an accomplice and co-defendant testifies may cross-examine such witness and interrogate him freely as to his motives, bias and interest, his relation to the crime and the persons connected with it, and any matters which tend to impeach his fairness or impartiality, and may bring out the fact that the witness had been granted immunity in a former trial after turning State's evidence against another party with whom the witness had been indicted for the same crime.

4. SAME—*testimony of accomplice should be acted upon with caution.* The testimony of an accomplice is competent and may alone be sufficient to sustain a conviction if it is of such character as to prove guilt beyond a reasonable doubt, but it is always subject to grave suspicion and should be acted upon with great caution.

5. SAME—*defendant may cross-examine witness as to relations with interested parties.* In a murder trial a witness for the State who has testified as to threats against the deceased by the defendant may be asked on cross-examination whether she at one time lived with the deceased and whether she had not for a few months lived with another party, who, as the defendant's accomplice, was charged with having fired the shot by which deceased was killed.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HARRY B. MILLER, Judge, presiding.

BENJAMIN J. COSSMAN, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, EDWARD C. FITCH, and MERRILL F. WEHMHOFF, (HENRY T. CHACE, and EDWARD E. WILSON, of counsel,) for the People .

Mr. JUSTICE DUNN delivered the opinion of the court:

An indictment was returned in the criminal court of Cook county charging George Backley and Rocco Maggio with murdering Frank Lamacchio. Maggio was tried separately on motion of the State's attorney, was found guilty of murder and sentenced to imprisonment for life, and has sued out a writ of error.

At ten o'clock in the evening of August 12, 1924, some shots were heard in the alley back of the house at 1723 Washburn avenue, in Chicago, and a Ford car was seen in the alley. A few minutes later Lamacchio's dead body was found lying in the alley with two gunshot wounds through the head, one in the body which passed through the heart, and one in his leg. Paul DeFranco and George Backley were indicted for the murder. On the trial Backley turned State's evidence, for which he was given his liberty by the State, and DeFranco was acquitted. Backley was subsequently indicted, together with the plaintiff in error, and was again arrested. On this trial, also, Backley was called as a witness by the People. Before he was called a colloquy occurred which is set forth in the abstract as follows:

Mr. Levy: "Mr. Cossman, step up to the bench. (Whereupon both counsel stepped up to the bench of the court.)

Mr. Levy: "If the court please, let it be understood that George Backley in this case has also testified in the

case where Paul DeFrank was tried and that he was given his freedom in consideration for his testimony, and that after this defendant has been arrested it became necessary to re-arrest Mr. Backley for the purpose of the prosecution of this case, and I don't believe that counsel can bring out the facts of his testimony in the prior case and of receiving his freedom, and I have information from the State's attorney's office that no such testimony of any other case can be offered.

The court: "I believe you are right, Mr. Levy.

Mr. Cossman: "Do I understand the court to hold that I have no right to bring out the fact of Mr. Backley's testimony in the former case and his receiving his freedom? After all, the former case was before this case and the same subject matter was involved.

The court: "No, you cannot bring that out.

Mr. Cossman: "Objection.

The court: "Overruled.

Mr. Cossman: "Exception. I believe there are a number of authorities which I can cite to the court on my proposition which will probably reverse your honor's opinion on this matter.

Mr. Levy: "I have information from the State's attorney's office, and it has been pretty well looked up, and they seem to be of the opinion that Mr. Cossman has no right to show that this witness has been released for his testimony.

The court: "This is too elementary.

Mr. Cossman: "Objection.

The court: "Overruled.

Mr. Cossman: "Exception."

Backley was then called and testified that he was a chauffeur, twenty-three years old, a co-defendant with the plaintiff in error, testifying as a State's witness with no promise of immunity but leaving himself to the mercy of the court; that he had known the plaintiff in error about

two years and Paul DeFranco about the same length of time, having been introduced to the latter by Maggio; that about August 1, 1924, he hired a car and drove about the streets in it with Maggio, DeFranco and two other men, called Tom and Dave, looking for Frank Lamacchio, whose name Backley did not know at the time but learned later. Maggio told him to catch a Taylor street car starting at Robey street, and he followed it to Jefferson street, driving sixty miles an hour, and caught it, but did not find the man on the car for whom they were looking, so they returned the car to the garage, and DeFranco, in the presence of Maggio, Dave and Tom, paid him $20 for driving. He saw Maggio nearly every day after that, and Maggio said he wanted Backley to drive some other night, to which the latter assented. On August 12 Backley met Maggio and DeFranco on the street and Maggio asked him to drive the automobile again. He said they wanted it for the same thing for which they had it before—to get Lamacchio. He said they were going to beat him up. They went to a garage at Twelfth street and Racine avenue together and saw Keller, the manager, who told them the Case car they had had before was out and if they wanted a car they would have to take a Ford. Maggio said that would be all right. Backley hired the car and Maggio, DeFranco and Morrie Kramer got in it with him. Maggio paid Backley $50 for the night before they started. They took Kramer along because they wanted a man to impersonate an officer. Maggio and DeFranco sat in the rear seat and Kramer in front, with Backley. After they started they drove through several streets and DeFranco pointed out Lamacchio, who was standing on the corner of Garibaldi and Polk. DeFranco and Maggio then left the car and went over to an alley between Washburn and Twelfth, where Maggio said Backley and Kramer were to bring Lamacchio. Backley and Kramer waited until Lamacchio walked up the street and then pulled up and stopped beside him. Backley had a star,

which he had given to Kramer, and the latter got out of
the car, showed it to Lamacchio and said he was wanted
at headquarters. He searched Lamacchio, took a pistol
from him and put him in the car. They sat in the back
seat and Backley in front, driving. They drove to the al-
ley where DeFranco and Maggio were waiting for them.
There DeFranco and Maggio got in the back seat with La-
macchio, and Kramer in front with Backley. There was
somebody in the alley, so they drove out to Paulina street,
going over to Washburn avenue, and when they got to the
light Lamacchio called out, "Let me out!" and started to
fight. Maggio told Backley to drive into the alley because
"he was getting tough." Backley did so and stopped about
100 feet from the corner. The door was kicked open and
DeFranco got out, holding an automatic pistol, and began
shooting at Lamacchio, whom Maggio was holding by the
shoulders, with his head just outside the door. Shots were
fired in rapid succession, and when the shooting ceased
Maggio got in the back seat and told Backley to go ahead,
and DeFranco ran down the alley. Backley drove as fast
as possible to Lincoln and Fourteenth streets, where Mag-
gio got out, shook hands with him and told him to keep
his mouth shut or it would be bad for him. Backley then
drove to the garage, where Keller saw blood on the fender
and two holes in the door. He kept $7 out of the $15 de-
posit which Backley had made, besides $3 for the use of
the car, and returned $5 to Backley.

On cross-examination of this witness the plaintiff in er-
ror's attorney offered to show that he had been arrested
in connection with the case and testified against DeFranco
and was given immunity for his testimony and that he was
testifying against the plaintiff in error in the hope of get-
ting immunity, but the court refused the offer, saying, "I
will not permit you to show anything of that kind; be care-
ful and don't ask such questions of the witness." Backley
was then asked if at the inquest he was asked whether he

had told all up to the present time, and answered, "Yes, sir," adding, "If you put me in a cell you will have a good story." He was asked what he meant by that answer, and an objection was sustained to the question. He stated that he did not testify at the inquest that there were four men in the automobile, and that the first time he told anyone that there were four men in the car was at the former trial—DeFranco's trial. The court sustained an objection to any questions as to what happened in the DeFranco case, saying it made no difference to this jury what happened in this man's case. He stated that he had made a confession, but his first confession was not true and he was making the right one now, and was telling the truth because he just wanted to tell the truth and help the State. He also identified several letters which he had written to the plaintiff in error while they were both in jail, asking the plaintiff in error to send him various small sums of money, for which he would testify that the plaintiff in error was not in the car the night of the murder.

Michael Keller testified that Backley, in company with Maggio and DeFranco, hired a car of him on August 12 about 9:15 in the evening, and Backley returned it about 10:30 with two bullet holes in the door and blood stains on the windows, the upholstering and floor and on the right rear fender. Keller drove the car to the station and reported to the police, and they kept the car. He did not know Maggio and DeFranco until after they were arrested. He never saw Maggio until August 12, 1924, and did not see him again until May 21, 1925, when he was asked to go to the police station to identify someone connected with this case. He went into the office, Maggio was brought in, Keller was asked if he knew him, and said he was the man.

Mary Beta testified that she was acquainted with both Maggio and Frank Lamacchio, and about August 1, 1924, she went with Lamacchio to a picture show. After the show he left her and took a street car on Taylor street,

and Maggio and DeFranco, who were at the corner where Lamacchio took the car, asked her where she had been. She tried not to see them but said she had been to the show. Maggio said, "You are not going to the show any more; we will get him." They saw him because they were right at the corner when he went over to get the car. They had a little Ford car there. In response to a question on cross-examination she answered that she lived with Lamacchio at one time, but an objection was sustained, and an objection was also sustained to a question whether she had lived with DeFranco.

Vito Ricco, an uncle of Maggio, who lived at Rockdale, near Joliet, in 1924, testified that Maggio was at his house during July, August and September, from July 15 to the middle of September. He was sick, and on August 12 he went to bed about seven o'clock and was asleep at ten or eleven o'clock.

Emil Macchetti testified that he saw Maggio in Chicago about October 3, 1924, and two or three times during the winter of 1925 at different times when Macchetti had his lunch. He was in Chicago all the time. He did not know where Maggio was on August 12 or 13, 1924, except that he saw him around the city at the times stated. He saw Maggio about fifteen or sixteen times.

Maggio testified that he was thirty-three years old and was born in Italy. He never met George Backley but knew him by sight. On August 12, 1924, he was living with Vito Ricco at Rockdale. He went there because he was sick. He had consumption or tuberculosis. He went there on July 5, 1924, and remained there over three months. In the evening of August 12 he was in Rockdale. He came back to Chicago in September and lived on Sawyer avenue. He lived in Chicago until his arrest and was engaged in his occupation of driving a truck and peddling chickens and ducks. He was arrested on May 20 while working on his truck on the street. He did not know Lamacchio, never

saw Backley or Kramer until after he was arrested, and
did not go to the garage or get the car with Backley and
DeFranco, as was testified to. He denied all participation
in the murder or knowledge of it. He knew DeFranco
when he first came from Italy, about two years before the
trial, but they were not friends. He was not acquainted
with Mary Beta but knew her by sight. He never talked
with her, never chased a Taylor street car, and she never
told him Lamacchio went down Taylor street, and never
talked with Maggio. On cross-examination he said that
he made a statement to the police at the detective bureau
and they made him sign it. Lieutenant Carroll came to
the detective bureau; and there was another, who knocked
Maggio's head down and made him sign that paper. A
paper was presented to the witness, who admitted that the
signature was his and that he remembered when he signed
it. His attorney then stated that if the prosecution in-
tended to introduce the paper as a confession the defend-
ant wanted a hearing before the court to determine its com-
petency. The court directed the jury to retire, and then
the State's attorney stated that he did not believe he would
introduce the confession—there was reference to another
case. The jury returned and the cross-examination of
Maggio continued for a time, when the following occurred:

Q. "I will ask you if you were not asked this question
and if you did not make this answer—

Mr. Cossman: "I object to that, if the court pleases.

The court: "Read the whole thing, Mr. Levy.

Mr. Cossman: "It may not be competent; let him offer
it in evidence.

The court: "When it is admitted, read the whole thing.

Mr. Levy: "If he wants it admitted I will read the
whole thing. Now, were you asked this question and did
you make this answer—

Mr. Cossman: "I object.

The court: "Overruled.

Mr. Cossman: "Exception.

Mr. Levy: " 'How long did you know Backley? A. Since last June.'

Mr. Cossman: "I move the answer be stricken out.

The court: "Overruled.

Mr. Cossman: "Exception. I further object to questions put to witness from the statement.

The court: "Overruled.

Mr. Cossman: "Exception.

Mr. Levy: "Were you asked that question and did you make that answer?

A. "I never saw Mr. Backley before in my life.

Q. "Will you just answer question? Were you asked that and did you make that answer?

A. "The 20th of May or 21st of May I seen him.

Q. "Did you say that on the 21st of May?

A. "I saw Backley on the 21st.

Mr. Cossman: "He says he saw Backley on the 21st of May.

Mr. Levy: "Were you asked that question and did you make that answer: 'Q. How long do you know Backley? A. I know him since last June.'

A. "Last June? No, sir.

Q. "You never said that, did you? (No answer.) I will ask you if you remember this question being asked you and your making this answer: 'Q. Now you are ready and willing to make a statement? A. Yes, sir.' Do you remember that?

A. "No, sir.

Q. "Now, was this statement made there to you: 'This is to warn you that any statement you may make now can be used for or against you in any future criminal proceedings that may be brought.'

Mr. Cossman: "I object to this line of cross-examination.

The court: "Overruled.

Mr. Cossman: "Exception.

A. "No, they made—

Q. "Never mind explaining—just answer the question. Do you remember that being asked you?

A. "No, sir.

Q. "Now, do you recall the night of August 12?

The court: "Mr. Levy, I am going to sustain the objection to these individual questions being asked unless the entire statement is introduced.

Mr. Levy: "It is for the purpose of impeachment.

Mr. Cossman: "I object.

The court: "Sustained. I will rule on the whole statement."

Nevertheless, the assistant State's attorney, in entire disregard of the ruling, immediately proceeded in the next and succeeding questions to ask Maggio if the police did not ask him whether or not he saw DeFranco and Backley on the night of August 12 and if he did not answer yes, and if he did not say to the police that he left Backley and DeFranco at Fourteenth and Loomis streets and they went away in the Ford car, and the court overruled the objections of the defendant's attorney to these questions. On his re-direct examination Maggio testified that Lieutenant Carroll, and another policeman as tall as he, beat him to make him sign the paper, and he signed after he was knocked down three or four times.

There was other testimony going to the credibility of some of the witnesses, but since the judgment must be reversed for the errors which, from what has already been stated, are apparent in the record, we shall not discuss the weight of the evidence or the credibility of the witnesses except the two defendants in the indictment, and a further statement of the testimony would only prolong the opinion unnecessarily.

It is apparent that the conviction depends in large measure upon the relative credibility of Backley and the plain-

tiff in error,—the former a co-defendant though not on trial, a confessed accomplice guilty of the murder and an active participant in the crime, who offered for a trifling consideration to sell his testimony and to testify directly contrary to what he swore on the trial were the actual facts; the latter the defendant on trial, with his life and liberty at stake on the verdict. Each is corroborated in part and contradicted in part by other witnesses and by circumstances. Whether the plaintiff in error was guilty or not, he was entitled to a fair and just trial, in which he should not be denied the application of established rules as to the competency of evidence and the right of cross-examination of the witnesses testifying against him. These rights were wholly disregarded, first by permitting the State's attorney to read from the statement signed by the plaintiff in error question and answer and asking him whether he was asked such question and made such answer, while the State's attorney did not even claim that the statement was competent evidence, but, on being given an opportunity to show that it was made under such circumstances as to be competent, declined to introduce evidence or offer the paper in evidence; second, by denying the right of the plaintiff in error to cross-examine his co-defendant testifying against him, who had been promised immunity from punishment for the crime, as to such immunity; third, by denying the right of the plaintiff in error to cross-examine witnesses against him as to their relations to Lamacchio, the dead man, and DeFranco, who was charged with having fired the shots by which he was murdered.

The prosecution did not offer Maggio's supposed confession in chief and it does not appear in the record. It is first mentioned in the cross-examination of the plaintiff in error. The assistant State's attorney produced it and had the plaintiff in error identify his signature and then had it marked for identification. The defendant's attor-

ney then stated that he wanted a hearing before the court
to determine its competency if it was intended to offer
it in evidence. There was no hearing, however, for the
State's attorney stated that he would not offer it in evidence. It is well settled that where a confession is offered
in evidence the defendant is entitled to have the evidence
of the circumstances under which it was made heard by
the court out of the presence of the jury for the purpose
of determining whether the confession is admissible, and
is entitled to a ruling of the court on that question before the confession can be received in evidence. (*People
v. Sweeney,* 304 Ill. 502; *People v. Fox,* 319 id. 606.)
No claim is made that the paper signed by the defendant
was admissible in evidence as a confession. It was not
offered in evidence as a whole nor was any part of it offered. The assistant State's attorney endeavored to get it
before the jury indirectly by reading questions and answers
contained in it and asking the defendant if he had not
made the answer contained in the statement to each one of
the questions. The plaintiff in error objected to several of
the questions and the court overruled the objections, but
later stated that he was going to sustain the objections to
these individual questions unless the entire statement was
introduced, but the State's attorney continued to ask the
questions and the court overruled the objections. This
course was the same as that pursued in the case of *People v. Sweeney, supra,* in which, the defendant having
denied making the answers, his statement was introduced
in rebuttal by way of impeachment. It was said in that
case that the objection made to the introduction of the
statement in rebuttal should have been sustained, because,
since the statement was incompetent in chief because made
under such circumstances as to be without probative value,
it was equally without probative value by way of impeachment. The cases of *Shephard v. State,* 88 Wis. 185, *People v. Yeaton,* 75 Cal. 415, *Harrold v. Territory of Okla-*

*homa,* 129 Fed. 47, *Morales* v. *State,* 36 Tex. 534, and *Brown* v. *State,* 55 Tex. Crim. 572, were cited in support of the holding, which they fully sustain. Since the supposed confession itself was of no probative value and incompetent as evidence, it was equally incompetent to permit the introduction of a part of it indirectly by reading from the written statement and compelling the defendant to answer whether he had made those statements.

Backley, when he was first put on the stand, testified that he had no promise of immunity offered him by either the State's attorney, the court or the police but was leaving himself at the mercy of the court. The court had assented, before he was offered as a witness, to the assistant State's attorney's proposition that the defendant's attorney could not bring out the facts of his testifying on the former trial and receiving his freedom and had no right to show that he had been released, and, in response to the defendant's protest and offer to submit authorities, had refused to consider them on the ground that the proposition was too elementary. The defendant's offer to show on cross-examination that the witness had been arrested for the murder and testified against DeFranco and was given immunity for his testimony and was now testifying against the defendant in the hope of getting immunity should have been received, but the court refused it and cautioned the defendant's attorney to be careful not to ask any such questions. The defendant had the right, on cross-examination, to ascertain the interest and feelings of the witness who was testifying against him, the motives which animated him and the hopes or fears which might be expected to influence his testimony. He was asked on cross-examination, "Then you were arrested once before in this case?" and answered, "Yes." To the next question, "What happened to your case then?" the court sustained an objection, and said, "It makes no difference to this jury what happened in this man's case." There was only one murder committed.

All those indicted for the crime were parties to the charge, whether indicted jointly or separately. The fact that they were not all indicted or tried together did not affect their rights. If Backley was granted immunity from punishment for the crime in consideration of his testimony, every person accused of the crime against whom he testified had the right to show that he had been granted such immunity, whether all were tried together or each was tried separately and regardless of the order of the trials, in order that the jury might, in weighing his testimony, draw such inferences from it as were proper, considered in connection with all the circumstances of his guilt and of the promise of immunity.

The testimony of an accomplice is competent evidence, and, although uncorroborated, may be sufficient to sustain a conviction if it is of such a character as to prove guilt beyond a reasonable doubt. It is always, however, subject to grave suspicion and should be acted on with great caution. (*People* v. *Harvey*, 321 Ill. 361; *People* v. *Johnson*, 317 id. 430.) A defendant against whom an accomplice in the crime testifies is therefore entitled to cross-examine such witness and interrogate him freely as to his motives, bias and interest, his relation to the crime and the persons connected with it, and any matters which tend to impeach his fairness or impartiality. The jury were denied the information that Backley had been promised freedom in consideration of his testifying against DeFranco, and the State's attorney presented him as being what he professed,—a defendant who had offered himself as a witness without promise of immunity or upon any consideration but a desire to tell the truth, and who had voluntarily undertaken to testify as a witness for the People solely from such desire to tell the truth and accept such punishment as the court might see fit to impose, without any restriction. The court should also have overruled the objection to the defendant's question asked of Backley on cross-examination, "What did

324—34

you mean by that?" referring to his statement at the inquest in response to a question whether he had told all up to the present time, the answer being, "Yes, sir," adding the statement, "If you put me in a cell you will have a good story."

It was also error to sustain the objection to the questions asked of Mary Beta whether she at one time lived with Lamacchio and whether she did not live with De-Franco for a period of three months. Counsel for the defendant should have been permitted to show what the relations of this witness were with the deceased and the others interested in the case. *People* v. *Warfield*, 261 Ill. 293; *People* v. *Schultz-Knighten*, 277 id. 238.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*