(No. 27842.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LILLIAN McFARLAND, Plaintiff in Error.

*Opinion filed March 21, 1944.*

FRANK A. McDONNELL, of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and THOMAS J. COURTNEY, State's Attorney, of Chicago, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, and JOSEPH A. POPE, all of Chicago, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

The defendant, Lillian McFarland, upon a trial by jury in the criminal court of Cook county, was convicted of the murder of Tony Civlla and sentenced to fourteen years imprisonment in the penitentiary. She seeks by writ of error to reverse the judgment.

The homicide occurred about 6:00 P. M., December 2, 1942, on the fifth floor of the premises of Martin Food Products in Chicago. This company was a packer of preserves and peanut butter. The deceased, Tony Civlla, was the foreman or superintendent in charge of operations on the fifth floor. He had authority to discharge employees on his floor and all increase of wages were made on his recommendation. Defendant was a colored girl, eighteen years of age, employed by the company on this floor. On the day in question a dispute arose between them concerning an increase in defendant's pay. She was dissatisfied with the amount of her increase. During the controversy she was discharged by Civlla and ordered to leave. The evidence shows that she then went to her home, obtained a revolver, returned to the plant, and shot and killed the deceased.

Carl Farber, office manager and accountant of Martin Food Products, testified that between 2:30 and 3:00 o'clock

in the afternoon defendant came into the general office on the fourth floor, demanding her money and saying she did not want to work upstairs any more; that when asked what was the matter she said: "He can't treat me like that," and further said: "I went up there to ask him about a raise and he told me I was discharged;" that the witness and Miss Lava, one of the secretaries, tried to quiet her, and after a period of time she regained her composure and talked more rationally; that witness told her that her last week's pay check was short $1.60, that they could not give her the check then because the party who signed the checks was not there, but the check would be mailed her; that this seemed to satisfy her and she apologized and left.

Paul Distenfield, an employee of the company in charge of its laboratory, testified that while walking past on the fifth floor, he saw Tony Civlla at work repairing one of the canning machines, and saw Lillian standing back of him; that he went on to the laboratory, heard a shot, went back and saw Civlla lying on the floor and Lillian standing over him with a gun pointed at him; that he did not remember just what she said, but remembered that she did not allow anyone to come near; that she gave the gun to James Jackson, an employee on the floor, from whom the witness took it and turned it over to the police.

Joseph Babka, a preserve cook, employed on the fifth floor, testified that sometime after five o'clock, while he and Tony Civlla were repairing a machine, Lillian McFarland came in and over to where they were working; that she first stood at the side of Tony for about ten minutes, and then changed her position and stood behind him for about five minutes; that during the time she stood there she said nothing and no one spoke to her; that after Tony finally finished working on the machine, he turned toward her and she shot him. He testified further that Tony had nothing in his hands when he turned around and made no threatening gestures; that after she had fired the one shot,

he took two steps toward her and said "I am shot," and fell to the floor. He further testified that Lillian then moved over in front of the deceased, shouting and waving the gun at him, saying he had treated her mean and that she would shoot him again, only she was not as merciless as he; that witness started toward Tony, but defendant waved the gun toward him and told him to keep away or she would shoot him too; that she stood over the deceased about five minutes, then walked over toward James Jackson, said she did not want to shoot Tony any more, handed the gun to Jackson and started crying.

James Jackson testified he heard the shot, but thought it was an electric machine backfiring; that when he first saw the defendant she was standing with a pistol in her hand, crying and saying Civlla had broken her heart and treated her like a dog; that she said, "Don't no one come near;" that she gave witness the gun and said, "I am not going to run. I am going to stay until the officer comes, because he mistreated me and broke my heart. He treated me like a dog."

Al Sider, president of Martin Food Products, testified that during the afternoon of December 2, 1942, defendant came to the office complaining that she had received a raise which was less than some of the other girls had received; that he told her Tony Civlla determined the amount of the raise to be given each girl. Sylvia Lava, secretary to the president, testified that about half an hour later defendant returned to the office, cursing in a loud voice, demanding her money and saying, "Who the hell does he think he is," and said, "I will see something is done about it. He can't talk to me like that." She further testified that she asked defendant to lower her voice, which defendant refused to do; that after about five minutes pleading with her, she took her to Mr. Farber's office and asked her to sit down and quiet herself. Witness testified defendant said, "He could have called me aside and told me to go;" that de-

fendant then calmed down and Miss Lava left her and returned to Mr. Sider's office; that defendant stayed in Mr. Farber's office about twenty minutes, then came to Mr. Sider's office and apologized, saying she was sorry if she had caused any commotion.

A written statement or confession made by the defendant was admitted in evidence. It was in the form of questions and answers propounded to her by an assistant State's Attorney. In this statement she admitted the shooting, with an explanation in some detail. The statement clearly reveals that after a heated argument with Tony, she went to her home, secured a pistol, returned to the plant and shot the deceased. From this statement made shortly after the homicide, it is clearly shown that the killing was not justified and was not in her necessary self-defense.

Defendant, upon the trial, testified substantially as set forth in her written statement concerning the occurrences on the day of the killing. She did, however, in addition, testify that Tony, since the October previous, had been making improper advances toward her; that she avoided him, and because of this he would curse her; that due to his conduct, she was in fear of him when she returned to the plant after being discharged on December 2. She testified she had no thought or intention of killing him unless he should attack her. She also testified that, when she went to Tony where he was fixing a machine, she asked him to go with her to the office to get her money and references for another job; that she waited about ten minutes, repeating her request; that he suddenly turned around, swinging at her with a wrench in his hand and kept coming at her; that she kept dodging and retreating, and fearing he would knock her in the head, she took the gun out of her purse, not intending to shoot him, but to fight him off with it. Two other girls employed on the fifth floor testified for defendant that they heard Tony talking in a loud voice like cursing and saw him rush toward defendant with an object

in his hand immediately before the shot was fired. Defendant also introduced evidence as to her good reputation. In rebuttal Veronica Chrusinski testified for the People that she was watching defendant during the time she was standing near Tony; that she saw Tony before and at the time the shot was fired and that he did not at any time swing at defendant with a wrench. It can thus be seen the evidence at this particular point is in sharp conflict. However, the acts and statement of the defendant militate against her contention that she was acting in self-defense. It is the province of the jury, which sees the witnesses and hears them testify, to determine their credibility and the weight to be given their testimony. This court is committed to the doctrine that it will not reverse a judgment of conviction as unsupported by the evidence merely because there is a conflict in the testimony, but will reverse only where the evidence is so unreasonable, improbable, or unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt. *People* v. *Tillman,* 383 Ill. 560.

Defendant, upon the trial, objected to the introduction of her written confession, and she now contends that the trial court committed error in allowing the same to be read to the jury. Before the court permitted the confession to be introduced, a hearing was had in the absence of the jury to determine its competency. There was no claim made on the trial and none is made here that the confession was not freely and willingly made or that it was induced by any force, fear, compulsion, threats or promises. Her sole objection in the court below was that she was not warned that any statement she made might be used against her. This does not render it incompetent. (*People* v. *Goldblatt,* 383 Ill. 176; *People* v. *Hoffman,* 381 Ill. 460; *People* v. *Fox,* 319 Ill. 606; *Wilson* v. *United States,* 162 U. S. 613, 16 S. Ct. 895, 40 L. ed. 1090.) Defendant's counsel, at the hearing, becoming so convinced, abandoned this ground, but stated he preserved his objection to the statement be-

cause "there may be some other elements that some other writer of the law may know." He now in this court contends that, because the statement was made on the same day and shortly after the homicide occurred while defendant was in the custody of the arresting officers, before she had been arraigned and without advice of either counsel or friends, its use in evidence was a denial to her of her constitutional right to a fair trial. Counsel relies upon the case of *McNabb* v. *United States,* 318 U. S. 332, 63 S. Ct. 608. In that case, however, the circumstances surrounding the making of the confessions were different from those in the case at bar and the cases are not analogous. The three McNabbs whose confessions were in question belonged to a clan of Tennessee mountaineers. None of the three had gone beyond the fourth grade in school. Freeman and Raymond McNabb were arrested in the middle of the night at their home, put in a barren cell and kept there for fourteen hours. For two days they were subjected to unremitting questioning by numerous officers. Benjamin McNabb, who surrendered voluntarily, was first made to take his clothes off for a few minutes, the officers telling him they wanted to look at him. This, as he testified, scared him "pretty much." He was questioned continuously for five or six hours and his confession finally secured when he was told he had been accused by the others. In the McNabb case the confessions were not freely and willingly made as in the case at bar, but the prisoners held out against making confessions until their resistance was worn down by the constant questioning of the officers having them in charge. There is no such evidence in the case before us and the two cases are entirely dissimilar. The defendant here is no ignorant mountaineer, but a high-school graduate, a person of intelligence, who won, by competitive examination, a university scholarship. Neither was she questioned unremittingly for two days, or any other length of time, before consenting to make the statement, but when asked

if she wished to make a statement, she replied at once in the affirmative. There is no claim of any mistreatment. Her confession was clearly proved to have been freely and voluntarily made. A confession is not rendered inadmissible by the mere fact that it was made while in the custody of the police (*McNabb* v. *United States*, 318 U. S. 332, 63 S. Ct. 608; *People* v. *Cox*, 383 Ill. 617;) or by the fact it was elicited by questions put by police officers or others, (*People* v. *Fox*, 319 Ill. 606;) or because made in the absence of the prisoner's attorney, friends or relatives. (*People* v. *Nelson*, 320 Ill. 273; *People* v. *Vinci*, 295 Ill. 419.) Neither do we believe the statement incompetent because made before defendant was arraigned and only about two hours after she was taken into custody. There is no claim that her arrest was illegal or of any illegal delay in arraignment. The fact that a prisoner is under illegal arrest does not of itself make a confession incompetent. *People* v. *Klyczek*, 307 Ill. 150.

Defendant, although making no claim that her statement is not true, contends that it is inadmissible because no mention is made therein of the purported fact that deceased, prior to the homicide, had attempted to seduce her and had persecuted and pursued her with improper advances. She claims the questions asked her did not bring out the whole truth and that the questions were framed to encourage and entrap her into convicting herself. There is no evidence whatever indicating any attempt to trick or entrap the defendant or to support her claim that she was given no opportunity to tell her complete story. An examination of the statement shows that she was asked if she had told everything about what had happened or about working with Tony and if there was anything about which she had not been asked that she wanted to tell, and she answered, "I have told you everything." After that, she was again twice asked if there was anything else she wanted to say, or if she had told everything, and each time she an-

swered that she had told everything. This statement, when transcribed by the stenographer, was carefully read by the defendant, and after a few minor corrections made by her, she signed at the bottom of each page. The decision of the court on the preliminary question as to the admissibility of a confession, when evidence has been heard as to the manner of its taking, will not be disturbed unless the decision is manifestly against the weight of the evidence. (*People* v. *Goldblatt,* 383 Ill. 176.) The court committed no error in allowing defendant's confession to be read to the jury.

In our judgment, the evidence in this case amply sustains the conviction. The judgment of the criminal court is therefore affirmed. 

*Judgment affirmed.*