(No. 36203.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GERALD STANLEY NEMKE, Plaintiff in Error.

*Opinion filed January 23, 1962.*

592

House, J., specially concurring.

DANIEL C. AHERN, and KEVIN J. GILLOGLY, both of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

PER CURIAM: Defendant was tried by a jury for murder, was found guilty, and was sentenced to death. On this writ of error, he contends that the trial court erred in overruling his motion to suppress purported confessions and in admitting the confessions in evidence, in refusing defendant's offers of proof, in preventing explanation by defendant of his flight and concealment and in refusing other proffered evidence, in denying a motion for a directed verdict, and in denying a motion for a new trial on the ground of improper argument by the prosecution.

The evidence is undisputed that Marilyn Duncan was sixteen years old, in good health, and working as a waitress on April 29, 1960; that she was seen with the defendant after 9:00 P.M. on that date, and that she was found unconscious by police officers at 8:00 A.M. the following day, lying along the Northwestern Railroad behind a factory at 5802 Northwest Highway in Chicago. She was found barely alive in a pool of blood and with extensive injuries about the head and chest. A pair of sun-glasses, a fifth-

gallon bottle of wine, and three bricks were found a few feet from her body. She was removed to a hospital, where she died without regaining consciousness on May 1, 1960.

The victim's wallet containing a photostatic copy of the birth certificate of defendant's sister, was found on May 2, 1960, about 50 to 75 yards from where her body had been found. Defendant was arrested on the same day and brought to the police station at about 5:30 P.M. and turned over to detectives O'Neill, Rauhut, and Jack and Sergeant Murphy. O'Neill, Rauhut and Jack questioned the defendant about the *Duncan* case until about 7:30 P.M., during which time he said he knew Marilyn Duncan and admitted ownership of the sun-glasses, but persistently denied harming Miss Duncan, and a partial written statement protesting his innocence was prepared. The taking of this statement was interrupted about 7:30 P.M. by the arrival of Chief of Detectives McMahon, who took over the questioning alone with defendant.

At about 8:20 P.M., McMahon called Captain Deeley, Sergeant Murphy and Detective Jack into the room to verify a story of defendant's admitting guilt, and about 8:30 P.M., defendant was taken to the State's Attorney's office, where he gave and signed two written statements confessing his guilt. He also had his clothes taken from him, was returned to the station about 1:30 A.M. on May 3, 1960, and from there was taken to the scene of the crime where he purportedly re-enacted it.

At the preliminary hearing on the motion to suppress confessions, the State first put McMahon, Chief of Detectives, on the stand, who testified that he questioned defendant between 7:20 and 8:30 P.M. on May 2, when only the two were present, at which time defendant orally admitted his guilt. McMahon testified that he made no promises to defendant, and did not threaten, intimidate, strike or coerce him, and added that the defendant was most cooperative. He specifically testified on cross-examination that the de-

fendant was not advised of his right to counsel, of his constitutional right not to make a statement or that any statement he might make might be used against him. The State then put on the court reporter, assistant state's attorney, and police officers, who were present in the State's Attorney's office at the time the written confessions were taken, and the court limited the cross-examination of them to their testimony in chief as to what occurred in the State's Attorney's office, although one of the police officers had been with the defendant at the station from 5:30 P.M. until Chief McMahon came in.

Defendant's counsel then testified that he had been retained by defendant's mother to represent the defendant, that he arrived at the police station about 7:30 P.M., identified himself, and demanded repeatedly to see the defendant but was repeatedly put off and denied access to the defendant, both by the police officials and on instructions from the State's Attorney's office, until defendant was removed to the State's Attorney's office about 8:30 P.M. These facts were not denied, and defense counsel did not see his client until the next morning in Boy's Court.

The defendant's mother testified to telephoning Detective Jack at the station at 6:00 P.M. and about 6:15 P.M. after hearing on the radio that the boy was in custody, but she was not permitted to testify as to the telephone conversations.

The defendant himself testified on the preliminary hearing, confirmed that he was intermittently questioned by Officer Jack and others from 5:30 until nearly 7:30, that he denied beating her, and after that he didn't say anything but "they just kept talking to me." He testified that he first learned the Duncan girl had died while a statement was being prepared that he didn't do it, the taking of the statement being interrupted by the arrival of Chief McMahon. He then testified that in response to McMahon's questioning he stated he had killed the girl. No claim was made of beat-

ing, third degree methods, or physical abuse at any time in the interrogation of the defendant. However, the trial judge repeatedly sustained objections on the part of the People when the defense attorney sought to elicit from the defendant the reason why he confessed.

Defense counsel made an offer of proof that the defendant's mother, if permitted, would testify that Officer Jack in the telephone conversations first denied that the boy was in custody and then on the second call turned from the phone and falsely called, "Jerry, your mother wants you to tell the truth." He made a further offer of proof that defendant, if permitted, would testify that the reason he admitted the slaying of the Duncan girl was that he was frightened, felt panicky, and had given up hope, and that the statements he gave were not the truth. These offers of proof were denied.

At no place in the record does it appear that defendant asked for counsel. All the witnesses present at the taking of the written statements and the giving of the oral statement to Chief McMahon testified. Not all of the police officers present during the period of interrogation from 5:30 to 7:30 P.M. during which guilt was denied were called, nor were the police officers who were called in by McMahon to confirm the giving of the oral statement, nor was their absence explained.

Defendant, relying primarily upon *Crooker* v. *California,* 357 U.S. 433, 2 L. ed. 2d 1448, and *Haley* v. *Ohio,* 332 U.S. 596, 92 L. ed. 224, contends that his constitutional right to counsel, not to give evidence against himself, and to procedural due process were all denied when the confessions were admitted against him. This case presents again the recurring problem in the administration of criminal justice of reconciling the responsibility of law enforcement officers to solve crimes against our social order with the right of the criminal defendant, however guilty, to be tried according to constitutional requirements.

Defendant's contention that the trial court erred in admitting the alleged confessions rests upon four closely related but logically distinguishable arguments: (1) that the denial of access to counsel was such a denial of constitutional right as to preclude the introduction of the confessions; (2) that the confessions were involuntary and, hence, inadmissible; (3) that the trial judge unduly restricted the scope of inquiry at the preliminary hearing to determine the competency of the confessions; and (4) that all persons whose testimony would be material to the issue of the voluntariness of the confessions were not called as witnesses at the hearing nor was their absence explained.

The testimony of defendant's counsel that he was not permitted to see the defendant is undisputed in the record. The right of one who is being held in custody to consult counsel is expressly recognized by the statutes of Illinois. "An Act in relation to the holding of persons in custody without their being able to notify their families or have legal assistance," approved May 14, 1951, (Ill. Rev. Stat. 1959, chap. 38, par. 449.1) provides: "Whoever shall, while holding another person in custody, deny that other person his right to consult and be advised by an attorney at law, whether or not such person is charged with a crime, and whoever shall prevent another person held in custody from notifying his family within 24 hours of the fact that he is being so held, shall be fined not less than $100 nor more than $1,000 or shall be imprisoned for not less than ten days nor more than six months, or both."

Section 229 of division I of the Criminal Code (Ill. Rev. Stat. 1959, chap. 38, par. 477), provides: "All public officers, sheriffs, coroners, jailers, constables or other officers or persons having the custody of any person committed, imprisoned or restrained of his liberty for any alleged cause whatever, shall, except in cases of imminent danger of escape, admit any practicing attorney at law of this state, whom such person so restrained of his liberty

may desire to see or consult, to see and consult such person so imprisoned, alone and in private, at the jail or other place of custody; * * *."

The People regard as significant the fact that there is no showing that defendant at any time requested a lawyer or inquired as to his right to counsel. This might or might not be significant in the case of a criminal prosecution against the officers involved for violation of one or both of the above-quoted statutory provisions. The question before us, however, is the effect of the conduct of the officers upon the admissibility of the confessions. For this purpose, in the case of a 17-year-old minor, we are unable to sanction a distinction based upon whether the lawyer who was denied access to his client was requested by the defendant himself or was retained by his mother. Regardless of whether the conduct of the officers constituted a violation of the letter of either statute, which, of course, cannot be conclusively determined in this proceeding, there is no question that it is indicative of a disregard of the basic policy underlying the statutes and an unconcern for defendant's right to counsel. This is, at the very least, a significant factor to be considered along with other factors in determining the competency of the confessions, despite any inference to the contrary that might be drawn from some of the language in *People* v. *Kelly,* 404 Ill. 281, 286.

In *Crooker* v. *California,* 357 U.S. 433, 78 S. Ct. 1287, 2 L. ed. 2d 1448, a majority of the Supreme Court of the United States, with four judges dissenting, rejected the contention that every denial of access to counsel is *per se* a denial of constitutional right without regard to the circumstances of the case. The court did, however, say that State refusal of a request to engage counsel violates due process if the accused "is deprived of counsel for any part of the pretrial proceedings, provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of jus-

tice.' " This latter determination, the court said, "necessarily depends upon all the circumstances of the case." (357 U.S. 433, 439; 2 L. ed. 2d 1448, 1454.) Applying this rule to the case before it, the United States Supreme Court felt that the circumstances negated any finding of prejudice, stating that "the sum total of the circumstances here during the time petitioner was without counsel is a voluntary confession by a college-educated man with law school training who knew of his right to keep silent." 357 U.S. 433, 440; 2 L. ed. 2d 1448, 1454.

Defendant correctly points out that the circumstances of the present case differ substantially from those in *Crooker* v. *California*. Here, instead of a mature man of 32 years, we have a boy of 17. Instead of a college-educated man with law-school training, we have a youth whose formal education ended after one year of high school. Instead of a person obviously well aware of his legal rights including the right to remain silent, we have nothing to indicate that the defendant knew of his rights and there is undisputed evidence that he was never advised of them by the police. Defendant urges that, under these circumstances, we should hold categorically that defendant was so prejudiced by the denial of access to counsel that to permit the use of the confessions at his trial would deprive the trial of "that fundamental fairness essential to the very concept of justice."

This court has been reluctant to hold that unlawful or improper conduct on the part of the police officers is of itself sufficient to render a confession incompetent irrespective of the actual voluntariness of the confession. Thus we have heretofore refused to adopt the Federal rule of evidence first promulgated in *McNabb* v. *United States,* 318 U.S. 332, 87 L. ed. 819, to hold that a confession given during a period of illegal detention, is, without regard to the voluntary or involuntary character of the confession, inadmissible in evidence. (*People* v. *McFarland,* 386 Ill. 122;

see *People* v. *Jackson,* 23 Ill.2d 274, 277, 280.) We have, however, recognized that illegal detention is a circumstance to be considered in determining the voluntary or involuntary character of a confession. (*People* v. *La Frana,* 4 Ill.2d 261; *People* v. *Hall,* 413 Ill. 615.) Since, under our view, this cause must be reversed and remanded for grounds hereinafter set forth, we are reluctant at this time to announce a rule that would absolutely preclude any use of the confessions upon a subsequent trial irrespective of what the proceedings after remandment might disclose as to the actual effect of the denial of counsel and the voluntariness of the confession.

Defendant's contentions that the confessions were coerced and that the trial court unduly limited the scope of inquiry at the hearing on the competency of the confessions may, in our view, be most profitably considered together. The record discloses few of the factors usually relied upon in cases where it is claimed that confessions were not voluntarily made. There is no evidence, nor does there appear to be any claim, of physical brutality, threats, deprivation of food or sleep, or of unusually prolonged and unrelaxing questioning. However, defendant claims that the confessions were involuntary because they were the result of psychological coercion. Despite the apparent absence of most of the usual indicia of coercion, this claim is deserving of careful consideration, particularly in view of the age of the defendant and the affirmative action of the police in depriving defendant of the benefit of counsel.

The question of whether a confession is voluntary depends upon the circumstances under which it was taken, and no single factor is determinative. Thus, in *People* v. *Hall,* 413 Ill. 615, 624, we said: "The effect of detention and questioning in coercing a confession, it seems to us, would vary in every instance, depending upon the place and length of time, the manner and extent of the questioning, and primarily upon the individual being questioned. Age, educa-

tion, experience and emotional characteristics could make questioning coercive in one case, innocuous in another."

In the recent case of *Culombe* v. *Connecticut,* 367 U.S. 568, 6 L. ed. 2d 1037, Mr. Justice Frankfurter, after an exhaustive review of the authorities, concluded that there is "no single litmus-paper test for constitutionally impermissible interrogation," that each of numerous factors "in company with all of the surrounding circumstances" is relevant; and that the ultimate test is that of voluntariness. (6 L. ed. 2d 1057.) These conclusions are in general accord with our decisions as illustrated by the foregoing quotation from *People* v. *Hall,* 413 Ill. 615.

The basic inquiry is whether or not the confessions in question were voluntary. The determination of this question depends not upon any one factor, but upon the totality of all the relevant circumstances. Thus, the scope of inquiry at the preliminary hearing must be sufficiently broad to place before the trial judge all of the relevant circumstances surrounding the taking of the confession and bearing upon the question of voluntariness. The precise scope of the preliminary hearing necessary to determine whether or not a confession is voluntary will depend somewhat upon the circumstances of each case. Thus, where the claim of coercion is based upon a single act of physical brutality allegedly committed at a particular time and place, evidence as to what took place at other times covering no claim of coercion might well be regarded as immaterial. (See *People* v. *Sims,* 21 Ill.2d 425, 433.) Where, however, the claim of coercion is based not upon isolated physical acts but upon the combined effect of the totality of circumstances, the scope of inquiry at the preliminary hearing cannot be so restricted. This is particularly true when, as here, the confession was taken from a 17-year-old boy whose counsel was denied access to him. Under these circumstances nothing that took place between the arrest of the defendant and his confession can be assumed to be irrelevant to the issue of

the voluntariness of the confessions. Under these circumstances, the rule requiring the production of all material witnesses should be enforced more rigorously than in the ordinary case, and defense counsel should be allowed considerable latitude both in the production of evidence and in the cross-examination of the State's witnesses.

In our opinion the trial judge unduly restricted the scope of the preliminary hearing and, as a result, did not have before him all the relevant circumstances necessary to an adequate judgment as to the competency of the confession.

Here the trial judge unnecessarily restricted defense counsel in his interrogation of the defendant in connection with the reason why he had confessed. He refused to permit defendant's mother to testify as to her telephone conversations with Officer Jack. Not all of the officers who were present at the questioning of the defendant prior to the appearance of Chief McMahon were produced by the State nor was the absence explained, although, under our view of the case, they were material witnesses as to the voluntariness of the confession. Moreover, the defense counsel was limited on his cross-examination of Officer Jack to what occurred in the State's Attorney's office. All of these matters were, in our opinion, of relevance to the question of the voluntariness of the confessions.

We have frequently noted that, upon preliminary inquiry into the voluntary nature of a confession, the question of its competency is for the trial court and that in making its decision the court is not required to be convinced of its voluntary character beyond a reasonable doubt. (*People* v. *Sims,* 21 Ill.2d 425; *People* v. *Miller,* 13 Ill.2d 84.) This, however, presupposes, a preliminary hearing at which all the relevant circumstances have been placed before the court for its determination. In our opinion, the court unduly limited the scope of the preliminary hearing and, for this reason, the conviction cannot stand.

Since the judgment must be reversed for the reasons indicated, it is unnecessary to consider the other assignments of error.

The judgment of the criminal court of Cook County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

Mr. JUSTICE HOUSE specially concurring:

I concur in the result solely on the ground that the closing argument was improper and prejudicial. The reversal is primarily predicated upon the assumption that the trial judge unduly limited the scope of the preliminary hearing on the voluntariness of defendant's confession. While the majority opinion states that, "we are reluctant at this time to announce a rule that would absolutely preclude any use of the confession upon a subsequent trial," the implication inherent in the statement that the confession may be excluded forces me to take exception to the majority holding.

The opinion requires further inquiry into the relevant circumstances surrounding the confessions before passing upon their admissibility. This is entirely unnecessary since the trial judge had the benefit of all relevant circumstances from the evidence adduced at the hearing and defendant's offers of proof. Within two hours of his arrest the defendant confessed to a brutal rape and murder, repeated it several times that evening and again to newsmen in Boy's Court the following morning. As noted in the majority opinion there was neither claim, proof or offer of proof of brutality, threats, improper interrogation or any act bordering on physical coercion. There was no reason for further inquiry as to physical coercion since that was not an issue.

It is claimed rather that there was psychological coercion. The attendant circumstances to bolster that claim were contained in two offers of proof and nothing more. First defendant offered to prove that he had been falsely told by a

police officer that his mother wanted him to tell the truth, although his oral confession was not made until 1¼ hours later. The second offer of proof was that defendant would testify that he confessed because he was frightened, felt panicky and had given up hope. Admitting the truth of his offers, (usually as favorable to the party making them as the facts and inferences to be drawn therefrom can possibly permit,) I fail to see how they could possibly support a charge of psychological coercion. The false statement was not that the mother had asked him to confess, but that his mother wanted him to tell the truth. Assuming that he was frightened, felt panicky, and had given up hope, and that he would so testify, that was but natural for one who had committed a heinous crime and avoided police capture by riding and sleeping in stolen cars for nearly 2½ days while under charge of murder. If there were any other circumstances surrounding the confessions which tended to indicate psychological coercion undoubtedly they would have been contained in the offer of proof. Under such circumstances this court should have held it was not reversible error to limit the scope of the examination at the preliminary hearing. The trial court was, as well as is this court, apprised of all the attendant circumstances. It seems to me that by refusing to approve the admission of the confessions at this time, the trial court in a subsequent trial may be misled into excluding them.

The majority opinion comments upon two other items. They are not given as reasons for reversal but are stated to be significant factors to be considered in determining the competency of the confessions. First, comment is made on the fact that counsel, procured by defendant's mother, was denied access to him until his arraignment. Assuming that it is immaterial that defendant did not ask for counsel himself, this denial of access is insufficient to warrant a reversal. (See *Cicenia* v. *LaGay*, 357 U.S. 504, 2 L. ed. 2d 1523; *Crooker* v. *California*, 357 U.S. 433, 2 L. ed. 2d 1448.)

Second, defendant was not apprised of his right to remain silent. Neither of these factors, nor both in conjunction with all other circumstances presented by this record, is sufficient to hold incompetent a confession given within two hours of arrest.

It seems fundamental that the right of reasonable interrogation between arrest and arraignment is necessary to law enforcement and should not be so circumscribed as to make it valueless. In the words of the late Mr. Justice Jackson, concurring in the result in *Watts* v. *Indiana*, 338 U.S. 49, 93 L. ed. 1801, "I suppose no one would doubt that our Constitution and Bill of Rights * * * represent the maximum restrictions upon the power of organized society over the individual that are compatible with the maintenance of organized society itself. * * * It cannot be denied that, even if construed as these provisions traditionally have been, they contain an aggregate of restrictions which seriously limit the power of society to solve such crimes as confront us in these cases. Those restrictions we should not for that reason cast aside, but that is good reason for indulging in no unnecessary expansion of them. I doubt very much if they require us to hold that the State may not take into custody and question one suspected reasonably of an unwitnessed murder. If it does, the people of this country must discipline themselves to seeing their police stand by helplessly while those suspected of murder prowl about unmolested. Is it a necessary price to pay for the fairness which we know as 'due process of law'? And if not a necessary one, should it be demanded of this Court? I do not know the ultimate answer to these questions; but, for the present, I should not increase the handicap on society."

Our constitutions are unique for their systems of checks and balances. Similarly, while we have a duty to recognize and enforce the rights of individuals, we also have the duty to protect the safety and welfare of the public. At some point between these conflicting interests a line of demarca-

tion must be drawn. If we exclude confessions under circumstances here presented we will have failed. We will have so enlarged the rights of an accused that we will thereby have deprived law enforcement officials of one of the weapons essential to their protection of members of the public, *i.e.,* the right of reasonable interrogation.