*In re* INTEREST OF DONALD LAMB, a Minor—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* DONALD LAMB, Respondent-Appellant).

(No. 58765;

First District (1st Division)—August 5, 1974.

James J. Doherty, Public Defender, of Chicago (Thomas J. Knitter, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Dennis J. O'Hara, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE EGAN delivered the opinion of the court:

The respondent, Donald Lamb, then age 16, was found delinquent within the provisions of the Juvenile Court Act (Ill. Rev. Stat. 1969, ch. 37, par. 702—2) and committed to the Department of Corrections, Juvenile Division. The court's declaration of delinquency was based upon a finding that on April 22, 1972, Lamb committed the offense of murder in violation of section 9—1(a)(2) of the Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(2)). The respondent's contentions are that his oral and written confessions were improperly admitted and the evidence did not establish his guilt under the theory of accountability.

Charlene Ruffin, the wife of the deceased Benny Ruffin, last saw her husband on April 22, 1972, at about 6 P.M. going around the corner of 21st Street and Trumbull in Chicago about a block from her home. The next time she saw him was around 11:15 that night when someone brought him to her back door. He "had blood all over" and told her that three boys tried to rob him. He did not know their names, but he recognized one of them from around the area. One of the boys later arrested with the respondent was Robert Bruce, who lived across the street from the deceased, who died on April 23, due to hemorrhaging from a stab wound of the neck.

Emma Atkins was visting a friend at 1919 South Trumbull. At about 11:30 P.M., she was on her way out of the house and saw men scuffling on the ground. One was on top of the other, choking him. As she and her friend stood on the porch looking at them, one of the men got up and ran through the alley saying, "Please don't shoot me." Mrs. Atkins heard a shot but did not see who fired it. When the two men were scuffling another man was standing over them. She could not identify any of the parties involved and stated the whole incident lasted about a total of 5 minutes.

Lamb was arrested on May 25, 1972, at 8 P.M. by Officers Soil and Blackley and taken to Area Four Homicide. On May 26, at 9:45 P.M., a statement was taken by Assistant State's Attorney John Gervasi in the presence of the respondent's mother and several police officers. The respondent later initialed each page and signed the last page. In the statement the respondent said the following:

He met Robert Bruce and Patrick Thatch at the corner of 21st and Trumbull, and he showed them a "blank" gun. Bruce thought it was a real one and asked him if he was afraid to stick someone up. When he told Bruce he was not, they went north on Trumbull "for the purpose of trying to find someone to stick up, or rob." They saw a man staggering in an alley near 1916 South Trumbull and intended to rob him. Thatch acted as a lookout; Bruce walked up to the man and Lamb "was not far behind." Bruce asked the man for a quarter, and when the man said he did not have one, Bruce knocked him down and jumped on him. The man was screaming and hollering, and when Bruce got up off the man, the respondent saw a knife in Bruce's hand. As the man was getting up holding his neck with both hands, the respondent pulled the gun out and aimed it at him. The man said, "Please don't shoot," and the respondent fired the gun in the air. Bruce had run away when the man got up off the ground. The respondent saw two older ladies on a porch, and he then ran away.

The respondent first contends that the statement should not have been admitted because he had been illegally arrested. This argument puts before us an issue that is recurring with increasing frequency: What is the test to be applied to verbal evidence following an illegal arrest? See, e.g., *People v. Brown*, 56 Ill.2d 312, 307 N.E.2d 356; *In re Interest of Tucker*, 20 Ill.App.3d 377, 314 N.E.2d 276; *People v. Brown*, 15 Ill.App.3d 606, 304 N.E.2d 662 (abstract opinion); *People v. Browder*, 13 Ill.App.3d 198, 300 N.E.2d 511 (abstract opinion).

■■ The first reason for rejecting the respondent's argument arises from his failure to advance in the trial court an illegal arrest as ground for suppressing his statement. In his motion to suppress, the respondent al-

leged as grounds that he had not been given the *Miranda* warnings and that the statements "were the direct or indirect result of either physical or mental coercion and were therefore involuntary." At no time was it ever suggested to the trial court that the respondent sought to suppress his confessions on the ground that he had been illegally arrested. We judge, therefore, that the issue has been waived. *People v. Nilsson*, 44 Ill.2d 244, 255 N.E.2d 432; *People v. Harris*, 105 Ill.App.2d 305, 245 N.E.2d 80.

Waiver aside, we judge that the respondent's position is untenable. No Illinois case has been cited by the respondent, nor do we believe one exists, which holds what the respondent urges. And in *People v. Mc-Farland*, 386 Ill. 122, 129, 53 N.E.2d 884, the court said expressly: "The fact that a prisoner is under illegal arrest does not of itself make a confession incompetent. *People v. Klyczek*, 307 Ill. 150."

The case most often cited in support of arguments similar to that of the respondent here is *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407. In that case federal narcotics agents made, the majority held, an illegal invasion of the defendant's home and arrested him in his bedroom where he was told that an informer had accused him of selling narcotics. He denied this but told the agents the name of a man who did sell narcotics and where he could be found. He also told them that he and the man he named had used heroin the night before. The Supreme Court held that his statement in the bedroom should not have been admitted.

Long before *Wong Sun*, our supreme court decided *People v. DeLuca* (1931), 343 Ill. 269, 271, 175 N.E. 370. In that case the police illegally searched the defendant and seized four hen pheasants, the possession of which constituted a violation of the game laws. An officer testified that at the time of the search the defendant admitted that he killed the birds. The court said: "[B]ut this admission was in connection with the unlawful search, and if the evidence obtained by the unlawful search should have been suppressed, the admission, *which grew out of the search and was developed by it and was a part of it*, should not have been considered." (Emphasis added.) It clearly appears in *De Luca* that the admission of the confession would have the practical effect of admitting the physical evidence illegally seized.

We do not believe that *Wong Sun* is authority for the sweeping rule that an illegal arrest, per se, renders any subsequent statement inadmissible. First, the government made a concession, damaging to its position, that the defendant's declarations in the bedroom were "to be excluded if they [were] held to be 'fruits' of the agents' unlawful action." (371 U.S. at 484.) Second, the Court held only that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized

arrest as the officers' action in [that case was] no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion." (371 U.S. at 485.) And last, the Court expressly avoided taking the position urged on us in this case: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation.]" (371 U.S. at 487-488.)

In *People v. Brown*, 56 Ill.2d 312, 317, 307 N.E.2d 356, the defendant was concededly arrested illegally and, after receiving *Miranda* warnings, made a confession. The supreme court, in discussing *Wong Sun*, held that the *Miranda* warnings "served to break the causal connection between the illegal arrest and the giving of the statements," thus impliedly rejecting the "but for" argument advanced here. In the case before us, *Miranda* warnings were given before any statement was made.

This court recently discussed *Wong Sun* and its impact on the exclusionary rule in *People v. Pettis*, 12 Ill.App.3d 123, 298 N.E.2d 372. In that case, the defendant was arrested for burglary, and a police photograph taken. Before trial he was identified from his picture by a robbery victim who subsequently identified him in person. At the trial for burglary the trial court held that his arrest was illegal. Based on that ruling the trial court conducting the robbery trial suppressed the photograph and subsequent identification, adopting the defendant's reasoning that but for the illegal arrest for the first offense his picture would not have been taken. We reversed the trial court's ruling and refused to make the "but for" test an extension of the exclusionary rule.

The purpose of the rule is to deter the lawless actions of police (*Linkletter v. Walker*, 381 U.S. 618, 637; *Mapp v. Ohio*, 367 U.S. 643, 648; *Elkins v. United States*, 364 U.S. 206, 222); but the rule has long had its critics, and its efficacy as a deterrent has been questioned. (See the dissenting opinion of Mr. Chief Justice Burger in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 411; Spiotto, *Search and Seizure: an Emperical Study of the Exclusionary Rule and its Alternatives*, 2 Journal of Legal Studies 243 (1973); Oaks, 37 U. Chi. L. Rev. 665.) And in *Fahy v. Connecticut*, 375 U.S. 85, the court held that the admission of illegally seized evidence could be harmless error where there was no reasonable possibility its admission had contributed to the defendant's conviction, thus seemingly ignoring the underlying deterrent rationale. Oaks, *supra*, at 671, n. 24.

But, accepting the validity of the deterrent theory, no one would dispute the contention that illegal detention is to be condemned and deterred with equal vigor, if not greater, as an illegal arrest. Yet Illinois courts have consistently held that illegal detention, per se, does not render a confession inadmissible but, rather, that it is but one "circumstance to be considered as to the voluntary character" of the confession. (*People v. Hall*, 413 Ill. 615, 623, 110 N.E.2d 249. See also *People v. Kees*, 32 Ill.2d 299, 205 N.E.2d 729; *People v. La Frana*, 4 Ill.2d 261, 122 N.E.2d 583.) The point to be made is that the extent of judicial suppression of evidence in order to deter illegal police conduct must be bounded by reason; it must not be a "punitive and extravagant application of the exclusionary rule" (dissenting opinion of Mr. Justice White in *Coolidge v. New Hampshire*, 403 U.S. 443, 517); and to hold that all evidence following an illegal arrest is ipso facto inadmissible would deprive law enforcement officers of not only the "fruit of the poisonous tree," but, to extend the metaphor, the wood, the leaves and even the shade as well. We believe, therefore, that the better rule would regard an illegal arrest like an illegal detention, a circumstance to be considered as to the voluntary character of the statement; and the arrest here will be so considered in the subsequent discussion of the respondent's contention that his confession was not voluntary.

The respondent next contends that the *Miranda* warnings were inadequate and there was no showing that he understood or knowingly waived them.

Officer Hensley testified that he advised the respondent an hour after he was arrested of his "constitutional rights about self-incrimination" by reading the warnings from a card and that the defendant, when asked if he understood them, said that he did.

Officer Deloughry testified that at 8:15 A.M. on May 26, he advised the respondent of his constitutional rights "by reading them from a plastic card which was issued by the Confederation of Police." He too testified that he asked the respondent if he understood what had been read to him and the respondent answered that he did. Immediately after this conversation the respondent went with the officer to 19th and Trumbull and made an oral statement that he, Bruce and Thatch had planned to rob a man staggering in the alley, that he fired a shot at the man and that Bruce stabbed him. So far as the record discloses this was the first statement of the respondent implicating him in the killing.

Neither side asked either officer to specify what was read from the cards, nor were the cards introduced. No objection was made to the form of the testimony of either officer although an objection was later

made to the shorthand reporter testifying that the respondent had been advised of his "rights."

The respondent testified that after he was arrested and taken to Area Four Homicide, Officer Soil and his partner questioned him and he told them he had nothing to do with the killing. After he was handcuffed and hung up over cell bars he was questioned again by Officer Soil, who, he said, "told me my rights." He too was not asked to specify what Officer Soil told him his rights were, other than a question by his attorney: "You mean right to remain silent?" The record reflects that no audible response was made to the question.

Youth Officer O'Driscoll testified that he advised the respondent of his constitutional rights at 9 P.M. on the 26th of May by reading them from a handbook which he had before him in court. When the State's Attorney asked him of what rights he informed the respondent, his answer, we conclude, was an accurate recitation of the specific warnings required by *Miranda*. The respondent stated that he understood them and that he had been advised of them before. The written statement, which, contrary to the respondent's assertion here, was admitted into evidence, reflects that Assistant State's Attorney Gervasi referred to the specific warnings made to the respondent before he began the statement and he repeated them which, again we conclude, were the specific warnings required by *Miranda*. The respondent was then asked by Gervasi if he wished to give up those rights and if he did so "knowing and understanding what [he was] giving up." To each question the respondent said, "Yes."

■■ The record amply justifies the trial court's conclusions that the respondent had received the warnings required by *Miranda* and that he knowingly and understandingly waived them. (*People v. Burbank*, 53 Ill.2d 261, 291 N.E.2d 161; *People v. Higgins*, 50 Ill.2d 221, 278 N.E.2d 68.) The respondent is not now in a position to argue that the conclusory testimony of the officers was insufficient since he never objected to their testimony nor did he argue its insufficiency in the trial court. In fact, in the summation on the motion to suppress, the respondent's attorney told the trial court: "[T]hey read off a card, and they read the correct rights supposed to be given to the minor respondent."

The respondent has cited a number of cases holding that police are required to desist in their questioning when a prisoner indicates he wishes to remain silent. We fail to see the applicabilty of those cases since there is no proof in the record that the respondent did so in this case. After the warnings he originally told them he had nothing to do with the killing. See *People v. Brooks*, 51 Ill.2d 156, 281 N.E.2d 326.

The defendant next contends that his statements were involuntary be-

cause they were obtained as a result of physical and mental coercion. Certain facts are established: The respondent, who was not attending school, saw Officer Soil at 7:30 A.M., 12 hours after he had been arrested. Soil asked him if he was hungry, and the respondent requested Polish sausage and pop. The officers brought him the food and a package of cigarettes. Before he saw Officer Soil that morning, he had slept in a chair with one hand cuffed to the wall. Two hours after he was arrested the police notified his mother, who told them she would have to wait until morning. She called the following morning and was told by the police "to get down there and see what it was all about." She did not go down to the station until 2:50 P.M. Before she saw her son he had gone with Officers Hensley and Deloughry on the morning of the 26th to the place where the man was stabbed. He made an oral statement which corresponded to that later given to Assistant State's Attorney Gervasi.

Later, his mother went with him to the State's Attorney's office at 26th and California where she told her son "if he had done anything wrong to tell the truth." She went back to the Maxwell Street station with her son and was driven home by the police. At about 8 P.M. she was brought back to the station and was present when her son made a statement to Gervasi. His picture was taken in her presence at the time the statement was made.

The respondent testified that after he was arrested he denied any knowledge of the killing and that he had been at a dance with a girl. Officer Soil told him he was lying and hung him up by handcuffs over a bar in the window where he remained on tiptoes for a half hour. (On direct examination he said Officer Blackley hung him up; on cross-examination he said Soil did it.) Officer Soil told him his "rights" and the respondent continued to deny any knowledge of the killing. He told them his "partner" was Patrick Thatch. The following morning Officers Soil and Deloughry took him looking for Thatch at Fagan High School. The officers did not ask him to relate how the murder happened, but he showed them where Ronnie Bruce and the deceased struggled on the ground and where Thatch stood as lookout. He also told them that the deceased staggered down the alley, that the deceased said "Don't shoot," and that he fired the gun. He testified that he made up the story.

Later he saw his mother at 26th and California and told her that he had been strung up the night before. (The only conversation that she testified to was her telling him to tell the truth.) At the State's Attorney's office, he told Gervasi he knew nothing about the killing. He was taken back to the station where he was again handcuffed and hung up by Officers Hensley and Deloughry for a half hour. After they struck him twice in the stomach and Hensley told him he would "frame" him with

a gun, he agreed to sign a statement. The respondent testified that he told Gervasi what Hensley had told him to say.

Officers Soil, Hensley and Deloughry all denied ever mistreating the respondent in any way. Edward Stabrawa, the shorthand reporter, and Officer O'Driscoll testified that they saw no marks or bruises on the respondent and denied that he was mistreated at any time in their presence.

■■ The competency of a confession is for the trial court alone to decide and its decision may not be disturbed on review unless it is manifestly against the weight of the evidence. (*People v. Carter*, 39 Ill. 2d 31, 38, 233 N.E.2d 393.) It is the totality of the circumstances surrounding the confession, and not any one of them, that is to be considered (*People v. Nemke*, 23 Ill.2d 591, 600, 179 N.E.2d 825); and the trial court need not be convinced of the voluntariness of the confession beyond a reasonable doubt. *People v. Weger*, 25 Ill.2d 370, 373, 185 N.E.2d 183.

This evidence establishes that the respondent was illegally detained, which does not per se render his confession inadmissible. (*People v. Kees*, 32 Ill.2d 299, 205 N.E.2d 729.) The evidence also establishes that the respondent was held overnight seated in a chair and handcuffed to a wall, disclosing a police procedure which is to be severely condemned. Since the respondent did not raise the question of an illegal arrest at the trial, we cannot say from a review of the record that the evidence supports his assertion here that the police did not have sufficient grounds to arrest him. Officer Soil testified that he and his partner were given information from Officers Triggs and Deloughry "which would indicate that Donald Lamb should be brought into the area and interrogated." What that information was and whether it would justify his arrest we may only speculate.

■■ On the other side, the evidence shows that he was informed of his rights early in the interrogation process; he was fed when and what he requested; he was permitted to see his mother, who was informed of his arrest shortly after it took place and who told him to tell the truth; he confessed orally approximately 12 hours after he was arrested; he was not questioned extensively or in relays; he made no complaints to the assistant State's Attorney, and his assertions of mistreatment are contradicted by the police officers and the shorthand reporter, who testified that there were no marks or bruises on the respondent's wrists. He was repeatedly informed of his rights, last by Assistant State's Attorney Gervasi, before the written statement was taken in the presence of his mother. He had been arrested twice before. Under all the evidence, therefore, we cannot say that the trial court's determination that the

confessions were voluntarily made is against the manifest weight of the evidence. See *People v. Higgins,* 50 Ill.2d 221, 278 N.E.2d 68; *People v. Hall,* 38 Ill.2d 308, 231 N.E.2d 416; *People v. Richardson,* 32 Ill.2d 472, 207 N.E.2d 478.

The respondent next contends that the confession should not have been admitted because the State failed to produce all the material witnesses to the statement or to explain their absence. During the time he was in police custody, the following officers who had contact with the respondent were not called: Investigator Blackley was Soil's partner and was identified by the respondent as the person who hung him over the bars; Investigator Sykes told Deloughry and Triggs that the respondent had told many different stories; Investigator Triggs was with Deloughry when the respondent made an oral confession on the morning of the 26th; Investigator Thomas was Hensley's partner and Youth Officer Flanagan was assigned to Area Four, but the record does not show whether either was present at any time the respondent said he was abused or when he was questioned.

After both sides had rested on the motion to suppress, the court adjourned until the following morning at which time it was to hear arguments. The next morning the State was allowed, over objection, to reopen the proof to explain the absence of certain witnesses. The respondent's objection was based on the fact that the motion was not timely and that the assistant State's Attorney's statements of the whereabouts of the witnesses was hearsay. The assistant State's Attorney explained that Assistant State's Attorney Gervasi was on trial, Officers Thomas and Flanagan were on furlough and Blackley and Triggs were testifying in other courtrooms.

Gervasi, Sykes, Thomas, Flanagan and Triggs were not required to be produced, since it is clear that none was present when the respondent was allegedly mistreated. (*People v. Joe,* 31 Ill.2d 220, 226, 201 N.E.2d 416; *People v. Beksel,* 125 Ill.App.2d 322, 261 N.E.2d 40.) Cf. *People v. Sloss,* 412 Ill. 61, 104 N.E.2d 807, where the supreme court held that the failure to call an assistant State's Attorney was error since the defendant testified that he told the assistant State's Attorney that he had been beaten.

The only witness whose testimony would meet the test of materiality on the voluntariness of the confession was Blackley, who, the record showed, was testifying in another court. At the hearing the respondent's attorney argued that being on furlough was not a valid excuse for failure to call a witness, but added: "When you say he is prosecuting at 26th and California, to me that is a valid excuse. If he is testifying, two days of testifying is very questionable. If he is testifying in another

branch, that, to me, is a good excuse." Whether Blackley's absence was sufficiently accounted for we need not decide because in our view the respondent's statement in the trial court constituted a waiver of the argument here.

Section 114—11(d) of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 114—11(d)) provides in part that on a motion to suppress a confession:

> "Objection to the failure of the State to call all material witnesses on the issue of whether the confession was voluntary must be made in the trial court."

■■ It is clear that failure to make a motion to suppress a confession in the trial court waives the question. (*People v. McMath,* 40 Ill.2d 388, 240 N.E.2d 593; *People v. Sims,* 32 Ill.2d 591, 208 N.E.2d 569.) This being so, there should be no doubt that a failure to make a specific objection on the ground that a material witness has not been called constitutes a waiver of that objection.

The function of an objection is to signify there is an issue of law and to give notice of the terms of the issue. (*People v. Trefonas,* 9 Ill.2d 92, 136 N.E.2d 817.) And the reason for requiring an objection to proof is to give the opposite party an opportunity to cure any defect. *People v. White,* 131 Ill.App.2d 652, 264 N.E.2d 228.

Who is a "material" witness is often debatable and uncertain. It may be the opinion of a prosecutor that a witness is not material, and he may rest without calling him. If an objection is then made, the trial court will perforce express his views on whether a particular uncalled witness is material. Under those circumstances the prosecutor should be given an opportunity to call that witness. He should not be placed in the position of making a subjective determination of whether a witness is material at the risk of being foreclosed from calling anyone who, after specific objection is made, is deemed material by the trial court. If any lawyer offered an exhibit and its admission was denied after objection on the ground that an improper foundation had been laid, who would say that he was forever barred from submitting additional foundation proof? It has been said before, and bears repeating, that a criminal trial is a search for the truth and is not a game.

We construe the remarks of the attorneys for the respondent to mean he was objecting to the failure to call the witnesses who were on furlough but was not objecting to the failure to call the person who was prosecuting (Gervasi) and the person who was testifying elsewhere (Blackley).

■■ We disagree with the respondent's contention that the remarks of his attorney were "gratuitous, irrelevant" observations. Instead, they were part of a spirited, detailed and comprehensive argument. And we

also disagree with the respondent's contention that his right of confrontation was violated by the failure to call Blackley and that he has a *constitutional* right to have all material witnesses to his confession called. The rule is judge-made (*People v. Sweeney*, 304 Ill. 502, 136 N.E. 687, citing dictum in *People v. Rogers*, 303 Ill. 578, 136 N.E. 470), a practical, not a mechanical one, designed to assist the fact-finder in determining whether a defendant's constitutional privilege against self-incrimination was abridged. *People v. Jennings*, 11 Ill.2d 610, 618, 144 N.E.2d 612; see also the special concurring opinion which criticizes the rule in *People v. Sims*, 21 Ill.2d at page 433.

■■ The respondent's last contention is that the State failed to prove that he was legally accountable for the killing. The evidence shows that he joined with two others for the purpose of committing robbery, that he pulled out a gun, which the deceased saw but did not know was "blank," and that one of the other robbers stabbed and killed the deceased. The respondent was an active participant in the robbery attempt and not just a bystander. He is, under the law, clearly accountable. *People v. Clark*, 30 Ill.2d 67, 195 N.E.2d 157. *People v. Rybka*, 16 Ill.2d 394, 158 N.E.2d 17.

The judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE and HALLETT, JJ., concur.